LEYDON v. MALLOY, ET AL.

MANION v. MALLOY, ET AL.

I. PAYING OFF LIEN WITHOUT INTENTION TO TAKE ANOTHER IN ITS PLACE.

The doctrine of subrogation is founded in equity and natural justice. Where one furnishes money to pay off incumbrances on land, and takes an incumbrance therefor, upon the understanding and belief that he is getting a valid lien upon the property, and it turns out that his lien is defective or of no value, he will be subrogated to the lien which was paid off with his money. But where a party furnishes the money to

pay off the lien, and the transaction shows that there was no intention to take any other lien in its place, the doctrine of su.rogation does not apply.

2. BISHOP MAY MORTGAGE CHURCH PROPERTY.

Where the bishop holds the title to land in trust for church purposes, and also has an equitable lien on the property for money loaned to build a church thereon, he is the owner of the legal title with an equitable interest in the property to the extent of the amount loaned by him thereon, and he may mortgage the property to that extent.

APPEAL from the common pleas court of Hamilton county.

The two cases above named were consolidated in the court below, and tried as one case.

On March 15, 1873, Ann Maria Maher and Eliza Kane, trustees of the Sisters of Mercy, being the owners of a tract of land in Cincinnati, "in consideration of the advancement of religion and one dollar in hand paid by John B. Purcell, Archbishop of the Arch Diocese of Cincinnati," conveyed said property "to the said John B. Purcell, Archbishop as aforesaid, his heirs and assigns forever, * * * for the purpose of preserving and maintaining thereon a church of Atonement or Reparation to the Sacred Heart of Jesus." The deed contained this recital: "It being understood and agreed by and between said parties, and is one of the considerations upon which this conveyance is made, that the said John B. Purcell, Archbishop as aforesaid, is to assume, pay off, and discharge an indebtedness existing on said building to the amount of $23,000, together with whatever interect may be now due or hereafter to become due on said amount, subject to which this conveyance is made."

The Sisters of Mercy had erected upon said land a stone chapel, and were in debt in the sum of $23,000 for money borrowed to build thesa me, of which $12,000 had been borrowed from John B. Purcell, and this indebtedness was assumed by the said John B. Purcell. In pursuance of the trust expressed in the deed John B. Purcell established a catholic congregation in said church thereafter known as the "Church of the Atonement," and held the property in trust for such congregation subject to the repayment to him of the said $23,000. The congregation and the priests successively appointed for the same always recognized and acknowledged the claim of said Purcell against them for said amount and his interest in and lien upon the property until they should repay the same.

On the 12th day of December, 1878, there was still due to the said Purcell more than $19,000 upon his claim. On that day he executed his promissory note, payable one year after date, for $3,642.38 with six per cent interest per annum, payable to his brother, Edward Purcell, and executed a mortgage upon said property to secure the payment of such note. This note and mortgage were executed for the purpose of being transferred to Mrs. Margaret Graf, who was a creditor of said Purcell for the amount mentioned in the note for money loaned him, evidenced by a deposit or pass book. She, on the same day, surrendered this deposit or pass book, and the said note and mortgage were thereupon indorsed and assigned to her. The mortgage was duly recorded on the 14th day of December, 1878. On December 16, 1878, the said Edward Purcell appealed to Rev. Patrick Cusack, then the pastor of the church of the Atonement, to assist him and his brother, John B. Purcell, in their financial troubles, and after several interviews it was agreed between the said Cusack and Edward Purcell acting on behalf of John B. Purcell, that the said Cusack would substitute the notes of his congregation for claims against John B. Purcell to the extent of the indebtedness of the congregation to John B. Purcell. Accordingly between the 17th of December, 1878, and the 3d of March, 1879, the said Cusack took up claims against John B. Purcell, including those of the plaintiffs in those two actions, and substituted therefor notes purporting to be the obligations of the Church of the Atonement signed by him as pastor. The persons taking such notes and surrendering their claims against Purcell were general creditors of the latter without any security, and many of them were members of the Church of

the Atonement. No agreement was made at the time, that these note holders were to be subrogated to the lien or equity of John B. Purcell against the church property. The notes of the congregation thus substituted for obligations of John B. Purcell amounted to the full amount of the indebtedness of the congregation to the said Purcell, and when the last note had been substituted on March 3, 1879, Father Cusack received a receipt in full for such indebtedness. During the progress of these negotiations and before the same were closed Father Purcell informed Father Cusack that he thought there was a mortgage upon the property, but no attention was paid to the remark, and Father Cusack did not know of Mrs. Graf's claim until her note became due, and she presented the same to him. He thereupon admitted the validity of her claim, entered the same upon the books of the church, and from time to time made payments thereon, amounting in all to $416.00.

From the time the congregation as founded, and up to within a few years of the bringing of this suit, Father Cusack and his predecessors and successors from time to time borrowed money from various persons for the purpose of improving the church and school connected therewith, and to pay more pressing claims against the congregation. For such borrowed money the pastor for the time being would give either a pass or deposit book, or a note of the congregation signed by him as pastor. Among such claims is the claim of Michael Schultz for money advanced to the predecessor of Father Cusack and used in the improvement of the church building.

On October 30, 1886, Margaret Leydon and Ann Manion each filed petitions against William Henry Elder, as successor of John B. Purcell and trustee of the property for the congregation, the pastor and church wardens and Mrs. Margaret Graf, praying that their notes be declared the first and best liens on the church property, for a sale of the same and other equitable relief. Mrs. Graf filed answers and cross-petitions in said suits setting up her mortgage, and praying a foreclosure of same and the payment thereof as the first lien. The other holders of notes substituted by Father Cusack between December 17, 1878, and March 3, 1879, for claims against John B. Purcell, had themselves made parties, and set up similar claims to the plaintiffs. Finally Michael Schultz and the other creditors, not holding novation notes, intervened to assert their claims and pray for a payment of the same out of the proceeds of sale of the property. None of the parties to the suit resisted a sale.

SWING, J.

In our judgment the mortgage of Mrs. Graf is a valid and subsisting lien against the premises in litigation. Archbishop Purcell, at the time he gave the mortgage, was the owner of the legal title coupled with an equitable interest in the land to the extent of over $20,000. This gave him the right to assign or mortgage the property to the extent of his equitable interest. It seems to us that the decision of the supreme court in the Mannix case, in which it is held that the assignment to Mannix carried with it the property assigned to the extent of the equitable interest held by Purcell settles this point.

The mortgage being good at the time given, we are unable to see how it has in any way become invalidated by the acts of its holder. The mortgage was duly recorded, and from that time it became a lien with notice to the world. It has not been paid, and no one has parted with his money through any representations of its holder that it was not a lien. It being conceded that the mortgage is valid as of the date of record, there is no question but what it is the first lien.

We are further of the opinion that the novation notes involved in this cause are not subrogated to the rights of Archbishop Purcell.

We have gone over this cause a number of times, and have spent a great deal of time in the consideration of this question. The question is not free from doubt, but our judgment is that these notes do not fall within the principle of the law of subrogation. Purcell was the holder of an interest in this property. The

Leydon v. Malloy et al.

holder of these notes held notes against Purcell. Purcell wanted his claim against the property paid. The holders of the notes against Purcell were induced to part with claims against Purcell, and take the notes of the congregation or the person representing this congregation. The transaction, as far as Purcell was concerned, simply amounted to the payment of this claim against the property. He did not intend to keep his claim against the property alive by transferring it to these note holders. As to the note holders we see nothing in the transaction which leads us to think that they thought they were stepping into the shoes of Purcell as to his claims on the property. While Purcell held his claim against the property, the claims of these note holders against him were personal merely— they held no claim through him against this property except as they might work it out after personal judgment against him.

The note holders took the notes of the congregation in lieu of their notes against Purcell, and they took these notes with the knowledge and understanding that the claim of Purcell against the congregation was paid in full. Purcell's claim was not to be kept alive by the transaction, on the contrary it was to be paid. These note holders did not seek to get Purcell's claim against this property, but what they wanted and what they got were the notes of the congregation, through their pastor, discharged of the claim of Purcell. There can be no claim made that these note holders did not get all that they thought they were getting. The doctrine of the law of subrogation is that it is a rule founded in equity and natural justice. Its most familiar application is where one furnishes money to pay off incumbrances on land and takes an incumbrance, which later proves defective, the party will then be subrogated to the rights of the valid lien against all but innocent purchasers for value. In such case the party parts with his money upon the understanding and belief that he is getting a valid lien on the property, and not getting it. Equity steps in and says that owing to the mistake the party shall be subrogated to the rights of the valid lien discharged by his money, and but for the belief that he was getting another valid lien, he would not have parted with his money.

But here no such state of facts exists. While these note holders furnished the money or its equivalent, to discharge the lien of Purcell against this property, the intent of the parties, as shown by the transaction, was not only to discharge the lien of Purcell, but there was no intention to take any other lien in its place. The note holders wanted the notes of the congregation discharged from any claim of Purcell, and this they got. There was no error or mistake of fact as to what the parties were doing or getting. The mistake was simply this: that as it now transpires the congregation cannot meet all its obligations, and these note holders are asking that they be given a lien on the land, something which they did not attempt, as we look at it, to get at the time.

The case, it seems to us, would be like a person furnishing money to one to pay off an incumbrance, and thus, without seeking or wanting to take a lien on the property discharged, takes the individual note of the party. The law will not subrogate the holder of the note to the rights of the discharged lien. The mistake, if any, is a mistake of judgment, and not of fact, and the law will not relieve as against it.

We find that there are no other liens against the property other than the lien of Mrs. Graf. Decree accordingly, and cause remanded to court of common pleas for execution.

*Roelker & Jelke*, for Margaret Leydon, Ann Manion, and other creditors.
*Stephens, Lincoln & Smith*, for Mrs. Graf and other creditors.
*Geo. J. Murray & D. S. Oliver*, for Michael Schultz and other creditors.